Jennifer W. Kennedy, CA SBN 185406
jenniferkennedyesq@gmail.com
JENNIFER W. KENNEDY
ATTORNEY AT LAW
61 S. Baldwin Avenue #1626
Sierra Madre, CA 91025
(626) 888-2263

Cameron L. Atkinson, *Pro Hac Vice*
catkinson@atkinsonlawfirm.com
ATKINSON LAW, LLC
122 Litchfield Rd
Harwinton, CT 06791
(203) 677-0782

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WE THE PATRIOTS USA, INC; JANE DOE, on her own behalf and on behalf of Child 1;<br><br>Plaintiffs,<br>vs.<br><br>VENTURA UNIFIED SCHOOL DISTRICT; ANTONIO CASTRO, in his official capacity only; ERIK NASARENKO, in his official capacity only; SARA BRUCKER, in her official capacity only; TONY THURMOND, in his official capacity only; ERICA PAN, in her official capacity only;<br><br>Defendants. | Case No.: 2:25-cv-04659-AB-JC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR AN INJUNCTION PENDING APPEAL** |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................5

LOCAL RULE 7-19 INFORMATION ................................................5

RELEVANT FACTS ....................................................................6

LEGAL STANDARD ...................................................................8

ARGUMENT ............................................................................8

I.   The Plaintiffs Show A Strong Likelihood of Success On The Merits..............8

   A.   *Mahmoud v. Taylor* requires strict scrutiny for school regulations that burden parents' right to raise their children in accordance with their religious beliefs. ..............................................................................9

   B.   The plaintiffs are entitled to strict scrutiny under traditional free exercise analysis. ...............................................................................11

     1.   A law lacks general applicability when any secular activity undermines the asserted government interest in the same way that the intended religious activity would. ......................................................................12

     2.   Medical exemptions substantially outnumbered religious exemptions, undermining § 120335's general applicability. ...............................17

     3.   The Plaintiffs state a colorable parental rights claim, entitling them to strict scrutiny under *Smith*'s hybrid-rights exception. ....................21

     4.   The Defendants showed hostility toward Doe's religious beliefs. ...........22

   C.   Cal. Health and Safety Code § 120335 and the Defendants' actions cannot survive strict scrutiny. ..........................................................25

II.   The Plaintiffs Establish Irreparable Harm. .................................28

III.   The Balance of Equities And Public Interest Favor The Plaintiffs............29

CONCLUSION .......................................................................29

CERTIFICATE OF LENGTH.......................................................30

CERTIFICATE OF SERVICE ......................................................31

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020)...............................................4, 8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...........
.................................................................................................... 14, 17, 22

*Doe v. San Diego Unified School District*, 19 F.4th 1173 (C.A.9 2021) ....................
.............................................................................................. 11, 15, 16, 17

*Elrod v. Burns*, 427 U.S. 347 (1976) ...............................................................27

*Employment Div., Dept of Human Resources of Oregon v. Smith*, 494 U.S. 872
(1990).................................................................................................... 20, 21

*Fellowship of Christian Athletes v. San Jose Unified School District Board of
Education*, 82 F.4th 664 (C.A.9 2023) .......................................................... 27, 28

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) ......................
.............................................................................................. 11, 12, 13, 14, 22

*Gonzales v. o Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006)
................................................................................................................13

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022)................................21

*Lowe v. Mills*, 68 F.4th 706 (C.A.1 2023) .........................................................8

*Mahmoud v. Taylor*, 145 S.Ct. 2332 (Jun. 27, 2025) ........................................9, 10

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S.Ct. 1719
(2018)................................................................................................... 22, 24

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ..............................................21

*Royce v. Pan*, 2025 WL 834769 (S.D. Cal. Mar. 17, 2025) ....................... 13, 15, 16

*San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (C.A.9 2004) .....
................................................................................................................ 20, 21

*Tandon v. Newsom*, 141 S.Ct. 1294 (2021) ................................... 12, 14, 16, 25, 27

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*,
76 F.4th 130 (C.A.2 2023)..............................................................................8

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (C.A.2 2021) ........................... 17

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................... 9, 21, 26

*Yellowbear v. Lampert*, 741 F.3d 48 (C.A.10 2014) ................................................ 14

**Statutes**

Cal. Health & Safety Code § 120325 ............................................................... 12

Cal. Health & Safety Code § 120338 ........................................................ 13, 25

Cal. Health & Safety Code § 120340 ............................................................... 25

Cal. Health Safety Code § 120341 .................................................................. 25

**Other Authorities**

2019 Cal. Legis. Serv. Ch. 278 (S.B. 276) ..................................................... 12

J. Morris Clark, *Guidelines for the Free Exercise Clause*, 83 Harv. L.Rev. 327
   (1969) ............................................................................................................ 14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL

## **INTRODUCTION**

Fed. R. App. P. 8 requires parties seeking an injunction pending appeal to apply to the district court before seeking a ruling by the Ninth Circuit, unless doing so would be impracticable. The Ninth Circuit typically enforces this rule unless other factors counsel against doing so. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 n.5 (9th Cir. 2020). Failure to comply jeopardizes any chance of success that the movants would have on appeal.

The Plaintiffs respect the Court's prior rulings even though they disagree with them. Plaintiffs now request that the Court either issue a ruling to give Child 1 the chance to receive an education without his mother being forced to abandon her religious beliefs, or deny this application swiftly so Plaintiffs can pursue their appellate remedies. Thus Plaintiffs respectfully request that the Court rule on this application as soon as possible.

## **LOCAL RULE 7-19 INFORMATION**

The following parties/counsel have appeared:

*For Defendants VUSD and Castro:*

David Adida, Esq.

Thomas M. Madruga, Esq.

Olivarez Madruga Law Organization, LLP

500 South Grand Avenue, Suite 1200

Los Angeles, CA 90071

213-744-0099

dadida@omlolaw.com

tmadruga@omlolaw.com

*For Defendant Erica Pan*:

Katherine Grainger, Esq.

Jacquelyn Young, Esq.

Jennifer Perkell, Esq.

California Office of Attorney General

455 Golden Gate Ave., Ste. 11000

San Francisco, CA 94102

Katherine.grainger@doj.ca.gov

Jacquelyn.young@doj.ca.gov

Jennifer.perkell@doj.ca.gov

The undersigned has tentatively identified counsel for Defendant
Thurmond:

Len Garfinkel, Esq.

General Counsel

California Dept. of Education

1430 N. Street

Sacramento, CA 95814

lgarfinkel@cde.ca.gov

The undersigned has identified counsel for Defendants Nasarenko and
Brucker:

Thomas W. Temple, Esq.

Office of the Ventura County Counsel

800 S. Victoria Ave. #1830

Ventura, CA 93009

Tom.Temple@ventura.org

## RELEVANT FACTS

Jane Doe is a practicing Christian who holds religious beliefs that abortion
is sinful, that to benefit from an abortion—no matter how remote in time—is a
sin before God, and that Christians have a duty to keep their bodies pure as the
temple of the Holy Spirit. ECF 50-3, ¶¶ 1, 3-5. She is raising her son, Child 1, in
accordance with these religious beliefs. *Id*. at ¶ 6.

Child 1 has been a student in the Ventura Unified School District ("VUSD") since 2014-15. *Id*. at ¶ 9. In March 2015, VUSD granted Doe a "personal beliefs exemption" exempting Child 1 from California's school immunization requirements. *Id*. at ¶ 9. Doe sought the exemption because she understood that the required immunizations are developed, tested, and/or produced using cell lines artificially developed from aborted fetuses and contain products that could harm a human recipient. *Id*. at ¶ 7.

Because Doe knew that the Defendants would accommodate her religious beliefs only until Child 1 reached seventh grade, starting in 2020 she obtained homeoprophylaxis immunizations for him that did not violate her religious beliefs. *Id*. at ¶¶ 11-12. She submitted this immunization proof to VUSD in August 2022. *Id*. at ¶ 13. VUSD accepted it, admitted Child 1, and raised no objection until December 2024. *Id*. at ¶¶ 14-15. On December 12, 2024, VUSD informed Doe that it would exclude Child 1 from school effective January 7, 2025 due to his immunization status. *Id*. at ¶ 16. His last full day of attendance was December 20, 2024. *Id*. at ¶ 18.

VUSD then excluded him from school. *Id*. at ¶ 18. Doe made multiple, unsuccessful efforts to resubmit immunization records and her religious objections. *Id*. at ¶¶ 18-23. VUSD ultimately summoned Doe and her husband to a mandatory School Attendance Review Board (SARB) meeting on March 12, 2025. *Id*. at ¶ 24. There, a Ventura County prosecutor, Sara Brucker, threatened Doe with criminal prosecution for truancy if she did not "cooperate" and send her son to school with the required immunizations. *Id*. at ¶¶ 26-35. At an April 21 SARB meeting, Brucker again threatened Doe with prosecution for truancy if she did not abandon her religious beliefs and vaccinate Child 1. *Id*. at ¶ 37. When

Doe refused, Brucker ordered Ventura Police Officer Matthew Thompson to criminally cite Doe for truancy.[1] *Id*. at ¶ 38.

The impact on Doe's son has been devastating. Because of disabilities, he struggles with social development. He has gone from an honor roll student with "A" and "B" grades to being awarded "F" grades on all his coursework. *Id*. at ¶¶ 39-42. Doe cannot afford to send him to private school, and cannot homeschool because she and her husband both work. *Id*. at ¶¶ 43-44.

Doe's son is enrolled in public school in Ventura Unified School District for the 2025-2026 school year, and Doe intends for him to receive instruction there. *Id*. at ¶ 48. The Defendants will not permit him to attend unless he receives the vaccinations that are religiously objectionable. *Id*. at ¶ 49.

## LEGAL STANDARD

The standard for an injunction pending appeal considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Al Otro Lado*, 952 F.3d at 1006-07 (cleaned up). "The first two factors ... are the most critical; the last two are reached only [o]nce an applicant satisfies the first two factors." *Id*. at 1007 (cleaned up).

## ARGUMENT

## I.    The Plaintiffs Show A Strong Likelihood of Success On The Merits.

Challenges to government vaccination requirements have turned on the question of which tier of scrutiny to apply: strict scrutiny or rational basis scrutiny. *See, e.g.*, *We The Patriots USA, Inc. v. Connecticut Office of Early*

---

[1] Counsel for Defendant Nasarenko represented to the undersigned on August 11, 2025 that Defendant Nasarenko has declined to prosecute the truancy citation.

*Childhood Development*, 76 F.4th 130 (C.A.2 2023); *Lowe v. Mills*, 68 F.4th 706 (C.A.1 2023). Challenges that receive strict scrutiny survive; challenges that receive rational basis review fail. Strict scrutiny applies here, and the Plaintiffs prevail under it.

### A. *Mahmoud v. Taylor* requires strict scrutiny for school regulations that burden parents' right to raise their children in accordance with their religious beliefs.

*Mahmoud v. Taylor*, 145 S.Ct. 2332, 2341 (Jun. 27, 2025) considered a parental challenge to the inclusion of "LGBTQ+ inclusive" storybooks into an elementary school curriculum and granted a preliminary injunction to parents who sought religious exemptions because of its conflict with their efforts to raise their children in their faith. *Mahmoud* clarified *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and is directly applicable here.

*Mahmoud* reaffirmed the broad principle that parents have the right "direct the religious upbringing of their children." 145 S.Ct. at 2350 (cleaned up). It also announced that "government policies that substantially interfere with the religious development of children…" violate that right. *Id.* (cleaned up). In particular, *Mahmoud* focused on the First Amendment's protection of "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts." *Id.* at 2351 (cleaned up).

*Mahmoud*'s analysis examined how various religious practices were burdened, noting that "for many Christians, Jews, Muslims, and others, the religious education of children is not merely a preferred practice but rather a religious obligation." *Id.* at 2351. The *Mahmoud* parents fell within this category. *Id.* at 2351. The First Amendment's protections here extend to choices "outside the home." *Id.* at 2351. Lastly, the Court found that, "due to financial and other constraints…, many parents have no choice but to send their children to a public school." *Id.* at 2351 (cleaned up). Thus, the First Amendment limits "the

government's ability to interfere with a student's religious upbringing," even "in a public school setting." *Id.* at 2351.

*Mahmoud* instructs courts to conduct a fact-intensive inquiry into whether "a law substantially interferes with the religious development of a child…." *Id.* at 2353 (cleaned up). The focus of the inquiry is the "very real threat of undermining the religious beliefs that the parents wish to instill in their children" posed by the requirement at issue. *Id.* at 2361 (cleaned up).

*Mahmoud* held that the books used by the Montgomery School Board did pose a real threat because they imposed "upon children a set of values and beliefs that are hostile to their parents' religious beliefs…" and "exert upon children a psychological pressure to conform to their specific viewpoints." *Id.* at 2355. Further, the presentation of the books by authority figures and the normative discussions that would take place would substantially interfere with the parents' ability to direct their children's religious upbringing. *Id.* at 2355.

*Mahmoud* may not be limited to the context of an educational curriculum or its specific facts as many courts did with *Yoder*. *Mahmoud* forecloses that approach: "We have never confined *Yoder* to its facts. To the contrary, we have treated it like any other precedent. We have at times relied on it as a statement of general principles…. And we have distinguished it when appropriate." *Id.* at 2357.

Lastly, *Mahmoud* rejects the notion that religiously objecting parents have the option to homeschool their children and that this claimed "option" makes the burden of the law less substantial. It notes that education is expensive, and "[i]t is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools." *Id.* at 2360.

Here, Doe avers that she is raising her son in accordance with her religious beliefs regarding the sanctity of life and the purity of the body as the temple of the Holy Spirit. ECF 50-3, ¶¶ 4-6. Doing so is "a sacred and God-given obligation…" for her. *Id*. at ¶ 6. Requiring her son to receive the required vaccinations would undermine the very foundations of the religious teaching that she has been raising him in and jeopardize his future adherence to it. *Id*. at ¶¶ 50-59.

That burden—placed squarely on Doe—fits precisely within the parameters of the burden that *Mahmoud* subjects to strict scrutiny.    Thus, *Mahmoud* requires strict scrutiny here.

## B. The plaintiffs are entitled to strict scrutiny under traditional free-exercise analysis.

The Plaintiffs are entitled to strict scrutiny on their Free Exercise claims for four reasons. First, *Tandon v. Newsom*, 141 S.Ct. 1294 (2021) clearly establishes that a law is not generally applicable when it permits any secular activity that undermines its interest the same way religious activity would. California's medical exemption for school immunizations meets that criterion. Second, even assuming *Doe v. San Diego Unified School District*, 19 F.4th 1173 (C.A.9 2021) controls, the Plaintiffs show that medical exemptions have historically and substantially outnumbered religious exemptions in California, undercutting any claim that Cal. Health and Safety Code § 120335 is generally applicable. Third, Plaintiffs present a colorable parental rights claim with with their Free Exercise claim, entitling them to strict scrutiny under the Ninth Circuit's hybrid-rights precedent. Fourth, the Defendants have displayed unprecedented hostility against Doe's religious beliefs, depriving their actions of the neutrality that the First Amendment demands.

**1. A law lacks general applicability when any secular activity undermines the asserted government interest in the same way that the intended religious activity would.**

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable…." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1876 (2021) (cleaned up). "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021).

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id*. Courts must compare "the risks [that] various activities" pose to the government's asserted interest, not the reasons for those activities. *Id*. A law is not generally applicable when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S.Ct. at 1877.

California has statutorily professed that its interest is in "the eventual achievement of total immunization of appropriate age groups" against various contagious diseases. Cal. Health & Safety Code § 120325. For SB276's amendments to California's immunization requirements in 2019, California's legislature made findings as to its interests. It found that "[i]mmunizations are public health measures to ensure protection against debilitating and sometimes fatal diseases." 2019 Cal. Legis. Serv. Ch. 278 (S.B. 276), § 1(a). The Legislature then found that "[i]mmunization requirements have led to greatly diminished or eliminated debilitating childhood diseases, such as measles." 2019 Cal. Legis. Serv. Ch. 278 (S.B. 276), § 1(b). California's legislature also recognized that "herd or community immunity"—as the result of "effective immunization"—

"not only protect[s] immunized individuals from disease, but also [has] the ability
to provide indirect protection for which immunizations are not effective or safe."
2019 Cal. Legis. Serv. Ch. 278 (S.B. 276), § 1(f). Lastly, it found that "[h]erd
immunity successfully occurs if and when a sufficient portion of the community
is immune. Herd immunity prevents sustained transmission of disease even when
immunization coverage is below 100 percent." 2019 Cal. Legis. Serv. Ch. 278
(S.B. 276), § 1(g). In other words, California clearly stated that its interest in
enacting the immunization requirement is to prevent the spread of specific
contagious childhood diseases and ensure that their consequences are mitigated if
there is an outbreak.

California further underscored that its interest is in preventing the spread of
*specific* contagious childhood diseases by preserving religious exemptions for
any immunizations not currently specified by statute and which the California
Department of Public Health might require through administrative regulation:

> Notwithstanding Sections 120325 and 120335, any immunizations
> deemed appropriate by the department pursuant to paragraph (11) of
> subdivision (a) of Section 120325 or paragraph (11) of subdivision (b)
> of Section 120335, may be mandated before a pupil's first admission
> to any private or public elementary or secondary school, child care
> center, day nursery, nursery school, family day care home, or
> development center, *only if exemptions are allowed for both medical*
> *reasons and personal beliefs*.

Cal. Health & Safety Code § 120338 (emphasis added). Providing personal belief
exemptions for future immunizations demonstrates that California's interest
really lies in preventing the spread of specific contagious diseases, not a general
interest in public health.

Defendant Pan acknowledges that Plaintiffs' reading is correct. In *Royce v.*
*Pan*, 2025 WL 834769, at *7 (S.D. Cal. Mar. 17, 2025), Pan argued that

"California's interest in SB 277 is to protect the health and safety of students and the public at large from the spread of infectious diseases." *Royce* erroneously construed this admission as a general interest in protecting public health and safety. *Id*. at *8. This Court should decline to commit the same error.

The Supreme Court has cautioned courts not to permit government to asserts interests "at a high level of generality." *Fulton*, 141 S.Ct. at 1881 (citing *Gonzales v. o Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430-432 (2006)). Government may not reimagine a clearly articulated state interest to make it more legally defensible. *See Fulton*, 141 S.Ct. at 1877 (rejecting such attempts); *Tandon*, 141 S.Ct. at 1296-97 (same), *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544-45 (1993) (same). Instead, "the First Amendment demands a more precise analysis." *Fulton*, 141 S.Ct. at 1881.

The Tenth Circuit described the compelling rationale for this rule. "At some great height, after all, almost any state action might be said to touch on 'one or another of the fundamental concerns of government: public health and safety, public peace and order, defense, revenue,' and measuring a highly particularized and individual interest 'directly against one of these rarified values inevitably makes the individual interest appear the less significant.'" *Yellowbear v. Lampert*, 741 F.3d 48, 57 (C.A.10 2014) (quoting J. Morris Clark, *Guidelines for the Free Exercise Clause*, 83 Harv. L.Rev. 327, 330–31 (1969)). In other words, asserting a state interest at the highest level of generality under the state's police power would necessitate a finding that every law is generally applicable. Supreme Court precedent does not permit that. *Fulton*, 141 S.Ct. at 1881.

Supreme Court precedent also does not permit governments to circumvent *Tandon*'s command to not consider the reasons certain exemptions are permitted by framing their interests at the most vague and general level of the police power. *Tandon*, 141 S.Ct. at 1296. Governments must proceed with a fair and specific-enough interest in the Free Exercise context.

14

This is a simple inquiry when approached with common sense. Consider this statement: "California requires school immunizations to protect the health and safety of children and the public." Nothing about that statement explains whether the school immunization requirements protect the health and safety of children or the public. It requires a leap of faith to trust government's wisdom in enacting the policy, and it provides no meaningful basis to conduct a "general applicability" analysis.

Next, consider this statement, which aligns with California's stated interests in the school immunization requirement: "California requires school immunizations to prevent the spread of contagious childhood diseases and mitigate their effects." This statement still falls under the state's police power to protect public health, but provides specificity that allows a court to assess whether the immunization requirement protects children's or the public's health and safety.

As discussed above, California has opted for a statement of its interests that is specific enough to allow this Court to assess whether the school immunization requirement protects children's or the public's health and safety. The Court should accept that statement and reject any invitation from the Defendants to reimagine California's interests in the immunization requirement.

Neither *Royce* nor *Doe v. San Diego Unified School District*, 19 F.4th 1173 (C.A.9 2021) compel a different conclusion. *Doe* relied solely on the San Diego Unified School District's litigation framing of its interest in its COVID-19 vaccination requirement. *Doe*, 19 F.4th at 1178 & n.5. Nothing in the preliminary injunction record supported or contradicted the District's framing of its interests.

Not so here. California expressly stated its interests in the legislative record, and those interests are clearly narrower than the interests professed in *Doe*. The Defendants cannot reimagine them to gerrymander the free-exercise analysis. Nor can the Defendants overcome California's preservation of personal

belief exemptions for immunizations not currently specified in the statutory scheme. California's interest in its immunization law is to prevent the spread of specific contagious diseases.

*Royce* accepted California's assertion of a general interest in protecting "the health and safety of students and the public at large" without question. 2025 WL 834769 at *7-8. It did not analyze the legislative statements of California's interests and the statutory structure that preserved personal belief exemptions for unspecified immunizations that the state may require in the future. *See generally Royce*, 2025 WL 834769. Instead, *Royce* treated *Doe* as recognizing a categorical and generalized state interest in health and safety. *Id*. at *8. *Doe* reached that conclusion because it was the statement of interest repeatedly advanced by the defendants, and it had no evidence to the contrary. *Doe* did not prevent a contrary ruling founded on proper evidence. *Doe*, 19 F.4th at 1177 n.4 ("Because this order is similarly predicting the likelihood of success of the appeal, our legal analysis is persuasive but not binding on future merits panels"). The Court should disregard *Royce* entirely.

*Tandon* controls: "Comparability is concerned with the risks various activities pose, not the reasons why people gather." 141 S.Ct. at 1296. Put differently, comparability does not consider the reasons a legislature consider an exemption to be wise, only the risks that exemptions pose to the generally applicable object of the law. The Defendants cannot avoid this inquiry by framing their interest so broadly that it guts the comparability analysis.

A comparability analysis is simple in this case. California's interest in its school immunization requirement is to prevent the spread and harm of contagious diseases through prophylactic immunization. A medically exempt child poses the same risk of undermining that interest as a religiously exempt child does. Viral contagion does not evaluate whether a child is un-immunized due to medical reasons or due to religious reasons—it infects each child indiscriminately.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL

Likewise, no infectious disease carefully considers whether a child carrier is un-immunized for medical reasons or for religious reasons before the infection spreads indiscriminately from either child to other people.

The risks posed to and by both un-immunized children are identical. *Tandon* requires the Court to compare the risks posed to and by a medically exempt child and a religiously exempt child on a one-to-one basis. Those risks to California's interests are identical. Thus, Cal. Health and Safety Code § 120335 lacks general applicability because of its medical exemption.

### 2. Medical exemptions substantially outnumbered religious exemptions, undermining § 120335's general applicability.

Assuming that *Doe* requires a comparability analysis based on the collective risks posed by religious and medical exemptions, the risks posed by religious exemptions are at least comparable to those posed by medical exemptions. In fact, the collective number of medical exemptions poses a far greater risk than religious exemptions ever did in California.

*Doe* borrowed the collective risk test from *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 286 (C.A.2 2021). *Doe*, 19 F.4th at 1178. *WTP* found, on a preliminary injunction, that religious exemptions likely outnumbered medical exemptions to New York's COVID-19 immunization requirement for healthcare workers by a large margin. 17 F.4th at 286. It relied on New York's limited data that showed religious exemptions far outnumbered medical exemptions in certain geographical areas. *Id*. at 286. *WTP*, however, allowed that the differences in the total number of medical and religious exemptions "may, after factual development, be shown to be too insignificant to render the exemptions incomparable." *Id*. at 286.

*Doe* also relied partially on language from *Lukumi*, 508 U.S. at 542-43: "the requirement of general applicability prohibits imposition of a burden only on conduct motivated by religious belief, while failing to prohibit nonreligious

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL

conduct 'that endangers [legitimate governmental] interests in a similar or greater degree.'" 19 F.4th at 1178 (cleaned up).

The California Department of Public Health collected detailed statistics on the rates of immunization rates, medical exemptions, and personal belief exemptions for kindergarteners in the 2014-15 and 2015-16 school years.[2] *See* ECF 50-4.[3]

In 2014-15, California reported a 90.4% immunization rate for kindergarteners in public and private schools. ECF 50-4, p. 4 (Table 1). Religious-based exemptions were 0.52% of exempted students. *Id.* Medical exemptions – "permanent medical exemptions" and "health care practitioner counseled" – were 1.83% of exempt California students – more than 3 times the number of religiously exempt students. *Id.*

In 2015-16, California reported a 92.9% kindergartner immunization rate in public and private schools. *Id.* Religious based exemptions were 0.56% of exempt students. *Id.* Medical exemptions accounted for 1.98% of exempt students – more than 3 times the number of religiously exempt children. *Id.*

The data shows that, before California's repeal of the personal belief exemption (which included philosophical and religious exemptions) in 2016, religious exemptions had far less of an impact on California's immunization rates than medical exemptions did. Thus, medical exemptions posed a far greater risk to California's interest in preventing the spread of contagious diseases than religious exemptions did.

---

[2] The Court may take judicial notice of government statistics. *See, e.g.*, *Rueda Vidal v. U.S. Dept. of Homeland Security*, 534 F.Supp.3d 604, 612 (C.D. Cal. 2021) (taking judicial notice of DACA statistics prepared by the federal government).

[3] Retrieved from https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/tk-12-reports.aspx

In 2016-17, California stopped reporting detailed data as to personal belief exemptions and simply began reporting "permanent medical exemptions" and "personal belief exemptions." It then reported the following percentages of permanent medical exemptions for kindergartners for every year that data is available since 2015-16:

- 2016-17:        0.5% permanently medically exempt;[4]
- 2017-18:        0.7% permanently medically exempt;[5]
- 2018-19:        0.9% permanently medically exempt;[6]
- 2019-20:        1.0% permanently medically exempt;[7]
- 2020-21:        0.6% permanently medically exempt;[8]
- 2021-22:        0.3% permanently medically exempt;[9]
- 2022-23:        0.2% permanently medically exempt;[10]
- 2023-24:        0.1% permanently medically exempt.[11]

This data demonstrates that California is comfortable tolerating an aggregate percentage of medical exemptions that fluctuates from being less than the number of religious exemptions claimed in 2015-16 to being double the number of religious exemptions claimed in 2015-16. In other words, California's conduct shows that it is comfortable with secular exemptions that, in the aggregate, do twice as much to undermine its interest in preventing the spread of contagious childhood diseases as religious exemption did. As such, religious and medical exemptions *are comparable* in the aggregate under *Doe*.

---

[4] ECF 50-5, p. 16 (Table 1).
[5] ECF 50-6, p. 17 (Table 1).
[6] ECF 50-7, p. 17 (Table 1).
[7] ECF 50-8, p. 17 (Table 1).
[8] ECF 50-9, p. 13 (Table 1).
[9] *Id.*
[10] ECF 50-10, p. 13 (Table 1).
[11] ECF 50-11, p. 13 (Table 1).

In 2015-16, Ventura County schools, including VUSD, reported a 94.2% kindergartner immunization rate in public and private schools. ECF 50-4, p. 10 (Table 4). Permanent medical exemptions were 0.2% of exempt students. *Id*. Healthcare-provider-advised exemptions accounted for 1.94% of exempt students. *Id*. at p. 16 (Table 6). In other words, medical exemptions accounted for 2.14% of exemptions in Ventura County. Conversely, religious exemptions accounted for 0.54% of exempt students. *Id*. at p. 16 (Table 6). That means that medical exemptions outnumbered religious exemptions by more than 4 times.

After California stopped tracking detailed reasons for personal beliefs exemptions in 2016-17, Ventura County reported the following percentage of medical exemptions every year since:

- 2016-17:        0.6% permanently medically exempt;[12]
- 2017-18:        1.0% permanently medically exempt;[13]
- 2018-19:        1.2% permanently medically exempt;[14]
- 2019-20:        1.1% permanently medically exempt;[15]
- 2020-21:        0.7% permanently medically exempt;[16]
- 2021-22:        0.2% permanently medically exempt;[17]
- 2022-23:        0.2% permanently medically exempt;[18]
- 2023-24:        0.1% permanently medically exempt.[19]

This data demonstrates that VUSD tolerates an aggregate percentage of medical exemptions that fluctuates from being less than the number of religious exemptions claimed in 2015-16 to being double the number of religious

---

[12] ECF 50-5, p. 20 (Table 3).
[13] ECF 50-6, p. 21 (Table 3).
[14] ECF 50-7, p. 21 (Table 3).
[15] ECF 50-8, p. 21 (Table 3).
[16] ECF 50-8, p. 19 (Table 3).
[17] *Id*.
[18] ECF 50-9, p. 19 (Table 3).
[19] ECF 50-10, p. 14 (Table 2).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL

exemptions claimed in 2015-16. Like the statewide analysis, this demonstrates that VUSD tolerates secular exemptions that in the aggregate <u>do twice as much</u> to undermine its interest in preventing the spread of contagious childhood diseases as religious exemptions did. In no universe does that justify permitting medical exemptions but not accommodating religious exemptions. As such, religious and medical exemptions *are comparable* in the aggregate under *Doe*.

Because religious and medical exemptions are comparable in an aggregate analysis, the Court should find that Cal. Health and Safety Code § 120335 lacks general applicability because of its medical exemption.

### 3. The Plaintiffs state a colorable parental rights claim, entitling them to strict scrutiny under *Smith*'s hybrid-rights exception.

*San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1031 (C.A.9 2004) recognized that *Employment Div., Dept of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) created an exception to the rule that rational basis review applies when a law is neutral and generally applicable. Under this exception, "the First Amendment [still] bars application of a neutral, generally applicable law to religiously motivated action if the law implicates not only the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press [.]" *San Jose Christian College*, 360 F.3d at 1031 (quoting *Smith*, 494 U.S. at 881)) (cleaned up). The Ninth Circuit calls claims of this nature "hybrid rights claim[s]" and applies strict scrutiny. *Id*. at 1031 (cleaned up). Hybrid rights claims arise when a free exercise claim is coupled with a "colorable claim that a companion [constitutional] right has been violated – that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *Id*. at 1032.

*Smith* itself enumerates various examples of such colorable claims. *Smith*, 494 U.S. at 881-82. *Smith* recognized "the right of parents… to direct the education of their children." *Id*. at 881 (citing *Pierce v. Society of Sisters*, 268

U.S. 510 (1925) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). *Yoder* recognized that *Pierce* had established "a charter of the rights of parents to direct the religious upbringing of their children." 406 U.S. at 233. *Pierce* noted that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 534 (cleaned up). Thus, *Pierce* held that parents had the right to educate their children in an equivalent private education system free from state interference. 268 U.S. 510. In *Yoder*, the Court held that the Old Order Amish could opt their children out of compulsory education at the eighth grade. 406 U.S. 205.

*Pierce* and *Yoder* both stand for the proposition that parents may refuse to permit their children to perform certain acts as part of their direction of how the children are raised. *Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022) (recognizing a First Amendment right to abstain from "physical acts.").

Thus, when parents show that they will not permit their children to perform a physical act and that objection flows from their religious beliefs, the parents have stated a colorable companion claim to a free exercise claim and are entitled to the strict scrutiny applied to hybrid rights claims. Plaintiffs here have done so, and they are entitled to strict scrutiny on their free-exercise claims.

### 4. The Defendants showed hostility toward Doe's religious beliefs.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S.Ct. at 1877. This rule prohibits even "subtle departures from neutrality." *Lukumi*, 508 U.S. at 534. It also prohibits government officials from acting "in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S.Ct. 1719, 1731 (2018).

*Masterpiece Cakeshop* found that the Colorado Civil Rights Commission had not acted neutrally when its commissioners "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community." 138 S.Ct. at 1729. It also took issue with a commissioner's comment that "[i]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise." *Id*. (cleaned up). *Masterpiece Cakeshop* also catalogued many other comments similarly hostile to Jack Phillips' religious beliefs. Thus, *Masterpiece Cakeshop* found that the Commission did not act neutrally in violation of the Free Exercise Clause.

Actions speak louder than words. This case presents a situation where the Defendants take the legal position—erroneous as it is—that they may exclude from California public and private schools those children whose parents religiously object to their receiving immunizations. In December 2024, Defendants discovered that Doe's son did not meet their criteria for immunization and expelled him from school despite knowing of Doe's religious exemptions to immunizations. Standing alone, those actions may not violate the Free Exercise neutrality guarantee, but the Defendants' next actions leave no doubt as to their view of Doe's religious beliefs.

The Defendants' first step was to award Doe's son "F" grades on his coursework for the spring 2025 semester. They summoned Doe and her husband to a mandatory "School Attendance Review Board" (SARB) meeting on March 12, 2025 under the pretenses of having a discussion with two VUSD officials on how to move forward. At that meeting, they surprised Doe and her husband with nine officials, including a county prosecutor. On one hand, VUSD officials claimed that they were there to help. On the other hand, they foisted primary control of the meeting onto Defendant Brucker. Brucker almost immediately

threatened Doe and her husband with criminal prosecution for "not cooperating" by sending their son to school with the required immunizations. At no point did Brucker provide Doe and her husband with the most basic constitutional protections that a rookie cop would know were required. She never issued *Miranda* warnings to them. She never gave them time to contact an attorney. She never told them that they were free to leave at any time if they wanted. Instead, Brucker gave Doe and her husband the distinct impression that, if they attempted to leave before she allowed them to, she would charge them.

At another mandatory SARB meeting on April 21, 2025, VUSD and Brucker openly threatened Doe and her husband with criminal prosecution if they did not abandon their religious beliefs and immunize Child 1. When they refused, Brucker ordered a police officer to issue a criminal citation to Doe, charging her with violating Section 48200 of the California Education Code.

To what purpose? No reasonable dispute exists that Doe and VUSD officials were at an impasse. Doe would not immunize her son for religious reasons. VUSD officials would not grant him a religious accommodation to allow him to complete his education. Common sense—a quality expected of reasonable adults—would have suggested a continued exclusion from school and instructions to Doe to homeschool her son. The Defendants did not behave like reasonable adults, however. Instead of respecting Doe's religious beliefs and simply adhering to their view of their legal obligations (mistaken as it is), the Defendants went out of their way to stigmatize and punish Doe and her son. They assigned him "F" grades throughout the semester, permanently ruining his academic record. They threatened and then criminally charged Doe for remaining faithful to her religious beliefs. Again, common sense dictated a far more reasonable path that did not involve punishing Doe and her son for their religious beliefs. Nothing required the Defendants to engage in this heavy-handed and bigoted conduct.

And yet they did. While there are no overt expressions of hostility in the record as to why the Defendants acted as they did, there is sufficient circumstantial evidence based on the alternatives available to the Defendants and their choices and actions for the Court to conclude that the Defendants displayed hostility toward Doe's religious beliefs. The Defendants' actions convey the same message as the Colorado Civil Rights Commissioners did: if a parent wants to raise children in the state and she "has got an issue" with the immunization law impacting her personal belief system, she "needs to look at being able to compromise." *See Masterpiece Cakeshop*, 138 S.Ct. at 1729 ("[i]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise.").

*Masterpiece Cakeshop* forbids this kind of religious bigotry. Because the Defendants are engaged in the same kind of hostility toward Doe's religious beliefs, the Court should subject their actions to strict scrutiny.

## C. Cal. Health and Safety Code § 120335 and the Defendants' actions cannot survive strict scrutiny.

"Strict scrutiny requires the [government] to further interests of the highest order by means narrowly tailored in pursuit of those interests." *Tandon v. Newsom*, 141 S.Ct. at 1298 (cleaned up). "That standard is not watered down; it really means what it says." *Id.* (cleaned up).

The Plaintiffs contest that the Defendants' interests are, indeed, "of the highest order." There is ample contrary evidence. First, the Defendants do not treat preventing the spread of contagious diseases as an inflexible requirement. They show ample flexibility when it comes to granting permanent or long-lasting medical exemptions – both by discretionary acts and by Cal. Health and Safety Code § 120335. They extend conditional admission to unvaccinated children as long as parents catch them up to California's immunization requirements within a

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR AN INJUNCTION PENDING APPEAL

given time period. Cal. Health & Safety Code § 120340. They extend unconditional admission to foster children whose immunization records are missing or unavailable. Cal. Health Safety Code § 120341. They affirmatively take no steps to exclude from school those children who receive special education services pursuant to an individualized education program ("IEP"). Cal. Health and Safety Code § 120335(h). They contemplate providing personal belief exemptions for other future immunizations that may be required by the California Department of Public Health. Cal. Health & Safety Code § 120338. In sum, California creates substantial flexibility in how the Defendants may pursue California's interests. That flexibility belies that these interests are of such a high order as to restrict religious exercise without violating the First Amendment.

Second, the Defendants accepted Child 1's alternative immunizations and permitted him to continue attending school for over two and a half years before they decided that he must be excluded. The Defendants had taken no steps to protect their interests from the supposed threat that Child 1 posed. That indifference also belies that the Defendants' interests are "of the highest order."

The Defendants also fail a narrow-tailoring analysis. Cal. Health and Safety Code § 120335 imposes a sweeping mandate that provides no flexibility, accommodation, or understanding to conscientious objectors. Neither does the Defendants' conduct. Conscientious objectors are faced with a choice between violating their religious beliefs or being excluded from public and private schools in California. For many, including Doe, their only practical option is to move. "Forced migration of religious minorities[, however,] was an evil that lay at the heart of the Religion Clauses." *Yoder*, 406 U.S. at 218 n.9. *Yoder* makes clear that laws and conduct that force migration are highly unlikely to survive a narrow tailoring analysis. Cal. Health and Safety Code § 120335 and the Defendants' conduct here —the criminal prosecution of a mother for the government-created consequences of religious exercise—are no different.

The Defendants had many options at their disposal to accommodate conscientious objectors. First, the Defendants could have statutorily or administratively provided for the exclusion of all vaccine-exempt children from school during an outbreak of contagious disease. This solution would have allowed the children of conscientious objectors to enjoy the same benefits as their peers under the California Constitution's guarantee of a right to education while preserving the Defendants' ability to prevent the spread of contagious disease. They did not. Second, the State Defendants – with all of the tools of modern public health science – could have identified a herd immunity percentage for schools, counties, and/or the state of California and divided exemptions equally between medical exemptions and religious exemptions, thus accommodating both religious and medical exemptions. They did not. Third, the State Defendants could have provided for alternative immunization practices of the kind that Doe sought to provide accommodation to conscientious objectors, and they could have coupled that solution with any of the others that the Plaintiffs propose. The State Defendants have made no statutory effort to do so, and VUSD itself has now reversed course on its previous acceptance of Doe's alternative practices. As Doe's son himself indicates, there is no evidence that such alternative immunization practices could not provide the Defendants with a reasonable alternative that would facilitate their interest. Fourth and finally, the State Defendants could have created statutory acceptance of titers testing to determine a child's immunity to the diseases enumerated in Cal. Health and Safety Code § 120335 and negate any claim of medical necessity for that child to receive certain immunizations. Defendants have made no effort to do that.

Because the Defendants did not provide any of these reasonable alternatives, both Cal. Health and Safety Code § 120335 and the Defendants' conduct cannot survive strict scrutiny. The Defendants have charted a course into stubborn unreasonableness, and Doe and similarly situated members of We The

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL of We The

Patriots USA, Inc. have bent over backwards to find a reasonable compromise that does not require them to abandon their religious beliefs. The First Amendment requires the Defendants to act reasonably, and the Court should hold them to that requirement.

## II.    The Plaintiffs Establish Irreparable Harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Tandon*, 141 S.Ct. at 1297 (same). The Ninth Circuit has observed that "[i]rreparable harm is relatively easy to establish in the First Amendment case because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664, 694 (C.A.9 2023) (cleaned up).

Plaintiffs have stated a colorable Free Exercise claim and a colorable hybrid-rights claim. Since both claims sound in the First Amendment, Doe has demonstrated irreparable harm.

Doe also shows irreparable harm as a practical matter. Every absence is a day of education lost to her son forever. ECF 50-3, ¶¶ 39-44. Her son, who already suffers from disabilities, is losing the valuable social experience associated with public schooling that is critical for his social development. *Id.* at ¶ 40. In other words, his continued exclusion from school is causing harm to him that will follow him for the rest of his life unless the Court intervenes.

Monetary damages are also unavailable. Qualified immunity shields the individual defendants from damages claims; the Eleventh Amendment shields the State; and a *Monell* claim is unlikely to succeed against VUSD. In other words, Doe's only hope for justice is injunctive relief.

**III.    The Balance of Equities And Public Interest Favor The Plaintiffs.**

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors – the balance of equities and the public interest – merge." *Fellowship of Christian Athletes*, 82 F.4th at 695. Because the Plaintiffs have, "at a minimum," "raised serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in [their] favor." *Id.* at 695 (cleaned up).

Excluding one child from school after admitting him for over two and a half years—in a non-compliant condition—undercuts the argument that the Defendants will incur hardship by allowing him to return. Child 1's attendance caused no hardships for 2.5 years, and nothing has changed to make his continued attendance during this case a hardship.

Lastly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 695 (cleaned up). For these reasons, the Court should find that the balance of equities tips in the Plaintiffs' favor, and that a temporary restraining order and a preliminary injunction is in the public interest.

## <u>CONCLUSION</u>

For the reasons stated above, the Plaintiffs respectfully request that the Court issue an injunction pending appeal.

Respectfully submitted,


Dated: August 19, 2025

**JENNIFER W. KENNEDY**
**ATTORNEY AT LAW**
BY:  /s/ *Jennifer W. Kennedy*
JENNIFER W. KENNEDY, ESQ.
California Bar No.: 185406
61 S. Baldwin Ave #1626
Sierra Madre, CA 91025-7076
(626) 888-2263
jenniferkennedyesq@gmail.com
Local Counsel for Plaintiff

**CAMERON L. ATKINSON**
BY: */s/ Cameron L. Atkinson*
*Pro Hac Vice*
ATKINSON LAW, LLC
122 Litchfield Rd
Harwinton, CT 06791
(203) 677-0782
catkinson@atkinsonlawfirm.com


## CERTIFICATE OF LENGTH

The undersigned, counsel of record for We The Patriots USA, Inc. and Jane Doe, certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1, and is a total of 25 pages per the Court's standing order, excluding the parts exempted by Local Rule 11-6.1.

*/s/ Cameron L. Atkinson*

Cameron L. Atkinson

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of August, 2025, I presented the foregoing pleading to the Clerk of Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Cameron L. Atkinson*

Cameron L. Atkinson

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EMERGENCY
APPLICATION FOR AN INJUNCTION PENDING APPEAL